**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| CYRUS GEORGE LINK,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　　　Defendant. | CASE NO. 1:22-cv-01175<br><br>DISTRICT JUDGE CHARLES ESQUE FLEMING<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Cyrus George Link ("Plaintiff" or "Mr. Link") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  For the reasons explained herein, the undersigned recommends that the Court **VACATE and REMAND** the Commissioner's decision. On remand, the ALJ should explicitly consider the medical opinions of Dr. Yuhas, clearly articulate his findings as to the persuasiveness of Dr. Yuhas' opinions, and reassess Mr. Link's physical RFC in light of those findings.

## I.　　Procedural History

Mr. Link filed his DIB application on May 15, 2020, alleging a disability onset date of March 10, 2020.  (Tr. 15, 139-45.)  He alleged disability due to multiple physical and mental impairments, including: neck issues; back issues; neuropathy causing loss of leg

1

and arm mobility/usage; bilateral plantar fasciitis in both feet; bilateral meniscus tears in both knees; and bursitis in hips.  (Tr. 48, 59, 71, 82.)  His application was denied at the initial level (Tr. 67-71) and upon reconsideration (Tr. 78-82).  He then requested a hearing.  (Tr. 83-85.)  On April 13, 2021, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 28-46.)  The ALJ issued an unfavorable decision on April 28, 2021, finding Mr. Link had not been under a disability from March 10, 2020 through the date of the decision.  (Tr. 12-27.)  Plaintiff requested review of the decision by the Appeals Council.  (Tr. 136-38.)  The Appeals Council denied his request for review on May 9, 2022, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

## II.     Evidence

While the record in this case is voluminous, the evidence summarized herein is generally limited to evidence relating to the issue before this Court, which concerns the ALJ's consideration of medical opinion evidence relating to Mr. Link's physical impairments.

### A.     Personal, Educational, and Vocational Evidence

Mr. Link was born in 1968 and was fifty-one years old on his alleged disability onset date.  (Tr. 23.)  He completed high school and served in the military.  (Tr. 31.)  He worked as a custodian at the post office for twenty-four years.  (Tr. 31, 39-40, 42.)  He was incarcerated at the time of the hearing.  (Tr. 32.)

### B.     Medical Evidence

#### 1.     Treatment History

Mr. Link received treatment for a variety of physical impairments at the Veterans Affairs Medical Center ("VA") (Tr. 234-347, 615-1114), MetroHealth Medical Center ("MetroHealth")

(Tr. 348-614), Cleveland Clinic (Tr. 225-33), and Lake Erie Correctional Institute (Tr. 1115-1147, 1148-1780), both before and after his alleged onset date of March 10, 2020.

The record reflects that Mr. Link had MRIs of the cervical and lumbar spine and left foot in 2019.  (Tr. 400-01, 680-81.)  The MRI of the spine showed moderate right subarticular zone stenosis at L1-L2 and L2-L3 due to small disc extrusions with lesser degenerative changes at other levels.  (Tr. 400.)  The cervical MRI showed mild spinal canal narrowing from C3 through C6, and multilevel severe foraminal narrowing worse at C5-C6.  (Tr. 401.)  The left foot MRI was performed to rule out a plantar plate tear.  (Tr. 680.)  The impression was: no typical MRI sign of plantar plate tear; mild synovitis of the fourth flexor tendon sheath; mild plantar fasciitis; mild intermetatarsal bursitis; and mild degenerative changes of the left foot.  (Tr. 681.)

Mr. Link presented to Daniel Malkamaki, M.D., at MetroHealth in the Department of Physical Medicine and Rehabilitation ("PM&R") Clinic on October 1, 2019 for a social security disability evaluation.  (Tr. 399-404.)  Dr. Malkamaki explained that he would not treat Mr. Link's chronic pain because his practice was not consistent with prescribing opioids.  (Tr. 399.)  He recommended that Mr. Link schedule an appointment with one of their Pain and Healing providers.  (*Id*.)  Mr. Link indicated he would plan to follow up with one those providers, and would use the visit that day only for purposes of social security disability evaluation.  (*Id*.)

Mr. Link complained of pain in the cervical and lumbar region with bilateral lower extremity symptoms.  (*Id*.)  He reported that his pain was worse with standing and walking longer distances.  (*Id*.)  He said he could walk about twenty minutes before having to sit down to relieve his pain, and that his pain was relieved with medication, rest, and changing positions.  (*Id*.)  He reported receiving injections in his back and neck about five years earlier.  (*Id*.)  He also reported trying physical therapy three times without relief.  (*Id*.)

3

Dr. Malkamaki reviewed prior imaging, including lumbar and cervical MRI findings from 2019.  (Tr. 400-01.)  Examination of Mr. Link's cervical and lumbar spine showed tenderness, moderate to severe paraspinal hypertonicity, and limited range of motion.  (Tr. 403-04.)  His motor examination was 5/5 throughout the upper and lower extremities with normal tone, except for pain inhibition in the distal arms and triceps.  (Tr. 404.)  His sensation was intact to light touch in the upper and lower extremity dermatomes and his gait was stable.  (*Id.*)

Dr. Malkamaki stated he was not certain that Mr. Link would meet the strict criteria for social security disability from a musculoskeletal perspective.  (*Id.*)  He felt that Mr. Link might be able to improve his function and maintain at least a sedentary level job with optimization of his care.  (*Id.*)  He stated he would complete the social security disability paperwork once Mr. Link provided additional reports, including the MRI of his knees and an EMG report.  (*Id.*)  He encouraged Mr. Link to continue with treatment, and to speak to other providers regarding his pursuit of social security disability.  (*Id.*)

Mr. Link presented to Chong Kim, M.D., at MetroHealth on January 29, 2020 for an evaluation of neck pain.  (Tr. 372.)  He reported a history of HIV, neuropathy, and cervical radiculopathy, and complained of ongoing neck, arm, and hand pain that had been ongoing for years but had recently worsened.  (*Id.*)  He complained of numbness and tingling in his arms and hands that was worse with flexion and turning his head to the side.  (*Id.*)  He reported that his pain was worse on the left than the right.  (*Id.*)  He also complained of decreased grip strength and balance issues.  (*Id.*)  He said he was seeing a pain doctor, but his doctor was retiring.  (*Id.*)  He was taking narcotics and Neurontin with some relief.  (*Id.*)  He said he was scheduled for cervical spine surgery in March but noted he might be going to jail soon.  (*Id.*)

His physical examination showed limited range of motion in the neck and lumbar spine with positive facet loading and minimum tenderness.  (Tr. 375.)  Spurling testing was positive in the neck, greater on the left than right.  (*Id*.)  There was bilateral tenderness in the sacroiliac and limited range of motion in the hips and knees with no tenderness.  (*Id*.)  His strength was normal. (*Id*.)  His reflexes were normal except for diminished patella reflex in the left ankle.  (*Id*.)  His sensation was grossly intact, and his gait was normal.  (*Id*.)

Dr. Kim's impression was neck pain, cervical myelopathy (with surgery planned in March), cervical spondylosis, cervical radiculopathy, knee and low back pain, lumbar spondylosis, HIV neuropathy, bilateral sacroiliac joint pain, bilateral greater trochanteric bursitis pain, and bilateral hip pain.  (Tr. 375-76.)  Mr. Link declined Dr. Kim's offer to slowly wean him off pain medication.  (Tr. 376.)  He also declined Dr. Kim's offer to see him following his scheduled cervical surgery.  (*Id*.)

A cervical MRI performed in February 2020 (Tr. 514-15) showed "stable moderate to advanced cervical spondylosis" (Tr. 514).  Mr. Link presented to the VA for a neurology consult on March 19, 2020.[1]  (Tr. 263-66.)  He complained of weakness in his bilateral upper extremities, decreased sensation in his extremities, and worsening gait.  (Tr. 264.)  He said he had been seeing a physician at MetroHealth for his chronic neck pain and cervical stenosis, but he lost his insurance coverage.  (*Id*.)  Examination findings included decreased sensation to light touch in all four extremities, no appreciable proprioception while testing big toe, and minimal to complete loss of sensation in distal digits of hands and distal digits of the legs.  (Tr. 266.)  Dr. Ramahi noted that possible causes of Mr. Link's neuropathy included: HIV related neuropathy,

---

[1] The treatment notes reflect that Mr. Link saw various medical providers on March 19, 2020, including the chief of the neurosurgery section Alia M. Hdeib, neurologist Amani Ramahi, nurse practitioner Kaylee D. Bray, and resident Mohit Patel.  (Tr. 263-66.)

low B12 levels, and possible poor glucose tolerance.  (Tr. 263.)  Recommendations included lab work, an EMG, and an MRI of the thoracic lumbar spine.  (Tr. 263, 266.)

Mr. Link presented for a telemedicine visit with George L. Gelehrter, M.D., at MetroHealth regarding his chronic neck pain on March 23, 2020.  (Tr. 360-61.)  His prescriptions included Vicodin and Gabapentin.  (Tr. 360.)  He was also using a TENS unit.  (*Id*.)  He reported that his current treatment regimen was helpful, but his pain never went away.  (*Id*.)  He had planned on having surgery but said it was being delayed.  (*Id*.)  He reported: more weakness in his arms; pain in his arms, shoulders, and legs; and tingling in his fingers.  (*Id*.)

A thoracic spine MRI on April 7, 2020 (Tr. 667-71) showed degenerative changes with foraminal narrowings and lateral recess stenosis and degenerative changes of the cervical spine (Tr. 671).

During an April 30, 2020 telephone encounter with nurse practitioner Rhonda Sue Conn at the VA, Mr. Link reported that he was scheduled to have cervical surgery in early March but he lost his insurance.  (Tr. 254.)  He reported that he continued to have weakness in his hands and legs, problems using his hands to do things like open jars, and some imbalance with his gait.  (*Id*.)  Nurse Conn recommended that Mr. Link return to Dr. Moore at MetroHealth for further discussion of surgical options due to motor weakness.  (*Id*.)

Mr. Link returned to see Dr. Gelehrter on June 29, 2020 for follow up regarding HIV, neck pain, degenerative spondylosis, and neuropathic type pain.  (Tr. 354.)  He reported that he had not been doing well.  (*Id*.)  He said the weakness in his arms was worse, noting he could not hold a gallon of milk for too long.  (*Id*.)  He said his arms and legs fatigued easily, especially his legs after a couple of trips up and down stairs.  (*Id*.)  He reported falling and said that his legs gave out when getting out of bed.  (*Id*.)  He reported that his pain level was five out of ten that

day.  (*Id*.)  He said that the VA was going to cover the cost of spinal surgery by Dr. Moore at MetroHealth.  (*Id*.)  On examination, Dr. Gelehrter noted tenderness in the back and weakness in the bilateral upper extremities.  (Tr. 354-55.)  Mr. Link was taking Vicodin and Gabapentin, and was also using a TENS unit and thermal modalities to treat his pain.  (Tr. 355.)  He planned to have spine surgery once his legal matters were settled.  (*Id*.)

During an intake physical examination conducted at Lake Erie Correctional Institution on September 11, 2020 (Tr. 1126-32), Mr. Link's musculoskeletal examination revealed full range of motion of all four extremities (Tr. 1130).  His cervical range of motion was decreased with extension and flexion due to pain and he demonstrated tenderness along the paracervical musculature.  (*Id*.)  His lumbar range of motion was decreased with flexion due to pain.  (*Id*.)  There was edema in his extremities.  (*Id*.)  There were no gait abnormalities.  (*Id*.)

On October 12, 2020, Mr. Link presented to Cassandra Gilbert, RN, at Lake Erie Correctional Institution for a sick call, complaining of swelling in both legs, pain in his legs and feet when walking, and numbness on the bottom of his feet.  (Tr. 1177-78.)  On examination, Nurse Gilbert noted edema in both legs with pitting edema in the left lower extremity and swelling in other areas, including in his right arm and eye.  (Tr. 1178.)  Nurse Gilbert administered ibuprofen for leg discomfort and recommended that he elevate his feet as much as possible and drink more water.  (Tr. 1179.)  No activity restrictions were noted.  (*Id*.)

On October 29, 2020, Plaintiff presented for a sick call with Carrie Aiken, CNP, at Lake Erie Correctional Institution, complaining of left-sided chest pain. (Tr. 1200.)  Mr. Link's physical examination reflected pitting edema 3+ to his shins in the bilateral lower extremities, but full range of motion in all extremities and no gait abnormalities.  (Tr. 1201.)  Nurse Aiken

recommended a cardiology consult and good hydration.  (*Id*.)  She also noted that one of his medications could be causing the lower extremity edema.  (*Id*.)

Mr. Link presented to Anita Lyons, RN, at Lake Erie Correctional Institution for a sick call on December 29, 2020.  (Tr. 1390.)  He reported bilateral lower extremity swelling that came and went.  (Tr. 1391.)  He reported he had to take his Nitro daily when walking any amount of distance.  (*Id*.)  He stated that his pain usually started in his jaw, left shoulder and arm and he had chest tightness at times.  (*Id*.)  On examination, Nurse Lyons noted no weakness in Mr. Link's extremities and no tingling in his hands and feet, but bilateral +1 pitting edema in the bilateral lower extremities.  (Tr. 1391-92.)  Nurse Lyons recommended isometric exercises and leg elevation when at rest.  (Tr. 1392.)

During a medical care follow up at Lake Erie Correctional Institution on February 9, 2021 (Tr. 1538-42), Mr. Link's muscle strength was normal on examination (Tr. 1542).  There was no edema in his extremities and distal pulses were intact.  (*Id*.)

### 2.    Opinion Evidence

#### a.  Francis J. Yuhas, D.O.

Mr. Link presented to the VA on November 27, 2019 for a C&P Exam (aka compensation & pension exam or VA claim exam)[2] conducted by Francis J. Yuhas, D.O.  (Tr. 319-43.)[3]  Dr. Yuhas' examination was conducted in person and involved examination of Mr. Link's back, foot, and hip conditions.  (*Id*.)

Mr. Link's back-related diagnoses included degenerative arthritis and intervertebral disc syndrome L1-L2, L4-L5.  (Tr. 319.)  His back examination showed abnormal range of motion

---

[2] *See* https://www.va.gov/disability/va-claim-exam/ (last visited June 8, 2023).

[3] The C&P Exam record is also located at Tr. 961-98.

with pain on forward flexion, extension, right and left lateral flexion, and right and left lateral rotation. (Tr. 320.) Dr. Yuhas commented that the abnormal range of motion findings did not themselves cause functional loss. (*Id*.) Dr. Yuhas noted that there was pain with weight bearing and there was evidence of localized tenderness or pain on palpation of the upper and lower midline area of the back. (*Id*.) Dr. Yuhas also observed that pain and fatigue significantly limited Mr. Link's functional ability with repeated use over time, and that pain and fatigue significantly limited Mr. Link's functional ability with flare-ups. (Tr. 320-21.) Muscle strength testing was normal with no evidence of muscle atrophy. (Tr. 321.) Deep tendon reflexes were normal. (Tr. 321-22.) Mr. Link's sensory examination was normal in the thigh and knee, but sensation was decreased in the lower legs bilaterally and absent in the feet and toes bilaterally. (Tr. 322.) Straight leg raise testing was negative. (*Id*.) Dr. Yuhas observed that Mr. Link had the following symptoms in the bilateral lower extremities due to radiculopathy: mild intermittent pain, mild paresthesias and/or dysethesias, and mild numbness. (*Id*.) Dr. Yuhas indicated that the severity of Mr. Link's radiculopathy was mild, involving the L4/L5/S1/S2/S3 nerve roots. (*Id*.) He noted that Mr. Link used a brace and shoe inserts. (Tr. 323.) Dr. Yuhas opined that Mr. Link's back condition would impact his ability to work, explaining: "Work requiring heavy lifting and forceful repetitive back motions would not be recommended." (Tr. 325.)

Mr. Link's foot-related diagnoses included plantar fasciitis and degenerative arthritis in both feet. (Tr. 328.) Mr. Link reported tenderness of his plantar surfaces, which was improved but not resolved with orthotics. (Tr. 329.) Dr. Yuhas observed pain in both feet on physical examination. (Tr. 330-31.) He found that Mr. Link's foot pain caused "disturbance of locomotion" and "interference with standing" (Tr. 331), and opined that Mr. Link's foot

condition would impact his ability to perform work-related tasks, explaining: "Work requiring prolonged sta[n]ding and walking would not be recommended."  (Tr. 332.)

Mr. Link's hip-related diagnoses included degenerative arthritis in both hips.  (Tr. 335.) His examination showed abnormal range of motion in both hips with pain on flexion, extension, abduction, adduction, and external and internal rotation.  (Tr. 336.)  Dr. Yuhas commented that the abnormal range of motion findings did not themselves cause functional loss.  (*Id*.)  Dr. Yuhas noted pain with weight bearing, evidence of localized tenderness or pain on palpation of the trochanteric, and evidence of crepitus.  (*Id*.)  Dr. Yuhas observed that pain and fatigue significantly limited Mr. Link's functional ability with repeated use over time.  (Tr. 336-37.)  Dr. Yuhas also observed that pain and fatigue significantly limited Mr. Link's functional ability with flare-ups.  (Tr. 338.)  Muscle strength testing was normal with no evidence of muscle atrophy. (Tr. 339.)  Dr. Yuhas opined that Mr. Link's hip condition would impact his ability to perform work-related tasks, explaining: "[W]ork requiring prolonged standing and walking or squatting and kneeling would not be recommended."  (Tr. 340.)

### b.  State Agency Medical Consultants

State agency medical consultant Gail Mutchler, M.D., reviewed the record on initial review on July 29, 2020 and assessed Mr. Link's physical residual functional capacity.  (Tr. 53-54.)  She opined that Mr. Link could: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; push and/or pull with the upper and lower extremities, other than lift and/or carry; never climb ladders/ropes/scaffolds; occasionally stoop, crouch, and climb ramps/stairs; frequently balance, kneel, and crawl; and would need to avoid exposure to hazards such as machinery and unprotected heights.  (*Id*.)

10

State agency medical consultant Steve McKee, M.D., reviewed the record on reconsideration on September 17, 2020. (Tr. 62-64.) He affirmed Dr. Mutchler's physical residual functional capacity finding. (*Id*.)

## C.  Hearing Testimony

### 1.  Plaintiff's Testimony

Mr. Link testified at the April 13, 2021 hearing. (Tr. 30-42.) He testified that multiple physical impairments factored into his claim that he was disabled, including his heart condition, COPD, asthma, neck, back, hip and knee problems, peripheral neuropathy, edema, and plantar fasciitis. (Tr. 32-33, 36, 37.) He testified that he had to take his nitro pills two or three times each day. (Tr. 32, 38.) He also said that he had numbness, weakness, and fatigue in his hands, arms, feet, and legs. (Tr. 32, 33-35.) He testified to loss of grip strength and problems using his hands, stating that he dropped dishes, had a hard time writing with a pen or pencil, and had problems buttoning, tying shoes, and using zippers. (Tr. 34-35.) He also testified to problems pushing with his feet, stating that he no longer had a stick shift car because it was too hard for him to continuously push the clutch. (Tr. 34.) As to his lower back problems, he said he would end up throwing his back out and be out of work for a week or more if he did too much. (Tr. 32.)

Mr. Link testified that it was hard for him to stand or walk for long periods of time due to his medical problems. (Tr. 33.) He estimated being able to walk about one-hundred twenty steps before it was too painful for him. (Tr. 35-36.) He said he could not crouch or squat due to bursitis in his hips. (Tr. 36.) He could kneel and crawl, but it was difficult to do so and caused pain. (*Id*.) He testified to difficulty rising from a seated position. (Tr. 36-37.) He reported elevating his legs about eight to ten inches to help alleviate his edema. (Tr. 37.) He used a

CPAP machine to help with sleep apnea.  (Tr. 41-42.)  He used a TENS unit in the past, but he said he did not think he could use it at the correctional facility.  (Tr. 41.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 42-45.)  The VE classified Mr. Link's past work as a custodian as a semi-skilled, medium exertional job.  (Tr. 42.)  The ALJ asked the VE several different hypotheticals.  (Tr. 1011-14.)  In response to a hypothetical that described an individual with the light RFC ultimately assessed by the ALJ, the VE testified that the described individual would not be able to perform Mr. Link's past work but there were other jobs that the individual could perform, including mailroom clerk, merchandise marker, and electronics worker.  (Tr. 42-44.)

The ALJ next asked the VE to consider the same hypothetical except that the individual could stand/walk for four out of eight hours and would be limited to frequent bilateral handling, fingering, and feeling.  (Tr. 44-45.)  The VE testified that the individual could not perform light exertion level work, but there were sedentary, unskilled jobs that the individual could perform, including electronics inspector, lab tester, and final assembler.  (Tr. 44-45.)  The VE testified that there would be no jobs available if the individual were limited to occasional handling, grasping, and fingering.  (Tr. 45.)  The VE also testified that there were no transferable skills from Mr. Link's past job as a custodian.  (*Id.*)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and

vocational factors to perform other work available in the national economy.  *Id.*

## IV.     The ALJ's Decision

In his April 28, 2021 decision, the ALJ made the following findings:[4]

1.      The claimant meets the insured status requirements of the Social Security
        Act through December 31, 2024.  (Tr. 17.)

2.      The claimant has not engaged in substantial gainful activity since March 10,
        2020, the alleged onset date.  (*Id.*)

3.      The claimant has the following severe impairments: degenerative disc
        disease of the cervical and lumbar spines; degenerative changes of the left
        foot with mild synovitis; mild plantar fasciitis, and mild intermetatarsal
        bursitis; asthma; chronic obstructive pulmonary disease (COPD); coronary
        artery disease; major depressive disorder, recurrent; unspecified anxiety
        disorder; and post-traumatic stress disorder. (Tr. 17-18.)

4.      The claimant does not have an impairment or combination of impairments
        that meets or medically equals the severity of one of the listed impairments.
        (Tr. 18-19.)

5.      The claimant has the residual functional capacity to perform light work as
        defined in 20 C.F.R. § 404.1567(b) with lifting up to twenty pounds
        occasionally and ten pounds frequently, standing and walking for six hours
        in an eight-hour day, sitting for six hours in an eight-hour day, no limits on
        push/pull and foot pedal, occasional climbing of ramps and stairs, never
        climbing of ladders, ropes and scaffolds; frequently balance, occasionally
        stoop, frequently kneel, occasionally crouch and frequently crawl; no high
        concentrations of smoke, fumes, pollutants and dust, and never unprotected
        heights or dangerous moving machinery.  In terms of mental limitations, the
        claimant cannot perform complex tasks but can perform simple (routine)
        task defined as the basic mental aptitude to meet the demands of competitive
        remunerative unskilled work and includes the abilities to, on a sustained
        basis, understand, carry out and remember simple instructions; can respond
        appropriately to supervision, coworkers and the usual work situations and
        can deal with changes in routine work settings; can focus attention on
        simple or routine work activities for at least two hours at a time and can stay
        on task at a sustained rate such as initiating and performing a task that they
        understand and know how to do; can work at an appropriate and consistent
        pace and can complete tasks in a timely manner; can ignore or avoid
        distractions while working, can change activities or work settings without

---

[4] The ALJ's findings are summarized.

being disruptive; can only do low stress work meaning no high production quotas or piece rate work; and can have occasional interactions with public or coworkers meaning limited to speaking, signaling, taking instructions, asking questions and similar contact with no arbitration, negotiation, confrontation or supervision or commercial driving.  (Tr. 19-22.)

6.      The claimant is unable to perform any past relevant work.  (Tr. 22-23.)

7.      The claimant was born in 1968 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.  (Tr. 23.)

8.      The claimant has at least a high school education.  (*Id*.)

9.      Transferability of job skills is not material to the determination of disability. (*Id*.)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including mailroom clerk, merchandise marker, and electronics worker.  (Tr. 23-24.)

Based on the foregoing, the ALJ determined that Mr. Link had not been under a disability from March 10, 2020 through the date of the decision.  (Tr. 24.)

## V.      Plaintiff's Argument

Plaintiff's sole assignment of error is that the RFC is not supported by substantial evidence because the ALJ failed to evaluate or even acknowledge the medical opinions of Francis Yuhas, D.O., a physician with the VA who conducted a disability examination and opined that work requiring heavy lifting, forceful repetitive back motions, and/or prolonged standing and walking would not be recommended.  (ECF Doc. 8, pp. 13-17; ECF Doc. 11.)

## VI.     Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives

16

the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651

(6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not

be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge

between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio

2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.     Sole Assignment of Error: Whether RFC is Supported by Substantial Evidence Where ALJ Failed to Acknowledge or Evaluate Dr. Yuhas' Opinion**

In his sole assignment of error, Mr. Link asserts that the RFC is not supported by

substantial evidence because the ALJ failed to evaluate or even acknowledge the medical

opinions of Dr. Yuhas, who opined that work requiring heavy lifting, forceful repetitive back

motions, and/or prolonged standing and walking would not be recommended.  (ECF Doc. 8, pp.

13-17; ECF Doc. 11.)   Plaintiff asserts that the ALJ's failure to evaluate Dr. Yuhas' opinions is

not harmless because he was fifty-one years old on the alleged onset date and a reduction to

sedentary work would disable him under the Medical Vocational Guidelines.  (ECF Doc. 8, p. 16

(citing 20 C.F.R Part 404, Subpart P, App'x 2 § 201.12).)

The Commissioner argues in response that remand is not warranted even though "[t]he

ALJ did not expressly address Dr. Yuhas's statement that prolonged standing, walking, squatting

or kneeling were 'not recommended'" because: (1) the "vague statement was not a medical

opinion addressing specific functional limitations, and the ALJ was not required to address its

persuasiveness"; (2) Dr. Yuhas' "recommendations were not issued, or based upon an

examination performed, during the relevant period"; and (3) the ALJ implicitly rejected Dr.

Yuhas' recommendations when he considered and found persuasive the state agency medical

consultants' opinion that referenced the C&P examination reports.  (ECF Doc. 10, pp. 1-2, 6-11.)

### 1.   Regulations Regarding Evaluation of Medical Opinions

Since Mr. Link's claim was filed after March 27, 2017, the Social Security Administration's ("SSA") new regulations for evaluation of medical opinion evidence apply to his claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence* (*Revisions to Rules*), 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c. The regulations specify that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). The regulations also provide that the SSA "*will* articulate in [the] determination or decision how persuasive [it] find[s] *all* of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." 20 C.F.R. § 404.1520c(b) (emphasis added). "When a medical source provides one or more medical opinions . . . [the SSA] will consider those medical opinions . . . using the factors listed in paragraphs (c)(1) through (c)(5) of . . . section [404.1520c], as appropriate." 20 C.F.R. § 404.1520c(a) (emphasis added).

A "medical source" as defined in the regulations includes "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law . . . ." 20 C.F.R. § 404.1502(d). The five factors to be evaluated are supportability, consistency, relationship with the claimant, specialization, and other factors, but supportability and consistency are acknowledged to be the most important factors for consideration. 20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. § 404.1520c(b)(2). The regulations specify that the SSA "may, but [is] not required to, explain how [it] considered the factors in paragraphs(c)(3) through (c)(5)[.]" 20 C.F.R. § 404.1520c(b)(2).

As the foregoing indicates, the operative regulations establish that an administrative law judge is required to evaluate and articulate the persuasiveness of "medical opinions" provided by "medical sources."  It is undisputed in this case that Dr. Yuhas is a medical source under the regulations.  The dispute is over whether Dr. Yuhas provided "medical opinions" as defined in the regulations.  Accordingly, the undersigned turns next to that question.

### 2.  Whether Dr. Yuhas' Statements Constitute a Medical Opinion

Mr. Link asserts that Dr. Yuhas provided medical opinions based on the examination conducted on November 27, 2019 and argues that reversible error occurred because the ALJ failed to evaluate or even mention those opinions.  The Commissioner asserts that the ALJ was not obligated to evaluate Dr. Yuhas' statements because his statements do not constitute a "medical opinion" under the regulations.

For claims filed after March 27, 2017, the regulations define a medical opinion as "a statement from a medical source about what [a claimant] can still do despite [his] impairment(s) and whether [he] [has] one or more impairment-related limitations or restrictions in" one or more abilities, including his "ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching)."  20 C.F.R. § 404.1513(a)(2)(i).

Mr. Link asserts that the following statements by Dr. Yuhas constitute medical opinions under the regulations:

- work requiring heavy lifting and forceful repetitive back motions would not be recommended; and

- work requiring prolonged standing and walking would not be recommended.

(ECF Doc. 8, pp. 13-16; ECF Doc. 11, pp. 1-2.)

19

The Commissioner argues that these statements do "not define what Plaintiff could still do . . . despite his impairment, without 'manipulation and interpretation with supplemental evidence'" and are too vague to rise to the level of a medical opinion.  (ECF Doc. 10, p. 9 (quoting and relying in part on in part on *Robinson v. Commissioner of Social Security*, 2922 WL 17168444 at *3 (6th Cir, Nov. 22, 2022)).)   The undersigned finds the Commissioner's arguments unavailing.

As set forth above, a medical opinion is a statement from a medical source about: (1) "what [a claimant] can still do despite [his] impairment(s)"; and (2) "whether [he] [has] one or more impairment-related limitations or restrictions in" one or more abilities, including his "ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching)."  20 C.F.R. § 404.1513(a)(2)(i). The Commissioner looks only to the first part of the definition of a medical opinion and overlooks the second part, namely whether Dr. Yuhas provided a statement about whether Mr. Link has an impairment-related limitation or restriction in his ability to perform physical demands of work activities, including ability to stand, walk, lift, or perform other physical functions.  The undersigned finds that Dr. Yuhas' statements that prolonged walking and standing and heavy lifting and forceful repetitive back motions were not recommended due to Mr. Link's back, foot, and hip conditions (Tr. 325, 332, 340) fall within the regulatory definition of "medical opinion."

Additionally, the undersigned does not find the statements so vague as to absolve the ALJ from his obligation to evaluate the persuasiveness of the opinions.  Further, the undersigned finds the Commissioner's reliance on the Sixth Circuit decision in *Robinson* misplaced.  In *Robinson*,

the court concluded that a doctor's statements regarding the claimant's diagnosis and his raw test result numbers relating to the claimant's carpal tunnel condition did not qualify as medical opinions. *Robinson*, 2922 WL 17168444 at *3. The court explained that the doctor's "numbers themselves [did] not describe what Robinson [could] or [could not] do during the workday." *Id.* In contrast, Dr. Yuhas did not simply provide examination findings. He examined Mr. Link with respect to his back, foot, and hip conditions and provided medical opinions as to what Mr. Link could not do during the workday. Furthermore, the court in *Robinson* found that the ALJ had considered the doctor's findings, while the ALJ in this case did not mention Dr. Yuhas or consider his statements regarding limitations resulting from Mr. Link's impairments. *Id.*

The undersigned finds that Dr. Yuhas' statements constitute medical opinions under the regulations, and that the ALJ was therefore required to evaluate them for their persuasiveness. Accordingly, the undersigned turns to the Commissioner's second argument as to why the ALJ was not required to consider Dr. Yuhas' opinions.

### 3. Whether ALJ Was Not Required to Consider or Evaluate Dr. Yuhas' Opinion Because It Was Issued Prior to the Alleged Onset Date

The Commissioner argues Dr. Yuhas' report was not relevant and the ALJ was not required to discuss it because it was issued in November 2019, several months prior to the alleged onset date of March 10, 2020. (ECF Doc. 11, pp. 9-10.) The Commissioner contends that the evidence was not relevant because it did not address Mr. Link's condition during the relevant period, and because MetroHealh doctors reported an unremarkable musculoskeletal examination a month after Dr. Yuhas rendered his opinions. (ECF Doc. 10, p. 9.)

As a general matter, an ALJ is not required to discuss every piece of evidence in order to render a decision supported by substantial evidence. *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (holding an ALJ is not "required to discuss each piece of

data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a

reasoned conclusion") (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th

Cir. 2006) (per curiam)).  However, the evidence at issue here is medical opinions rendered by a

medical source who examined Mr. Link just a few months before the alleged onset date.  As

discussed above, the operative regulations specifically provide that the SSA "*will* articulate in

[the] determination or decision how persuasive [it] find[s] *all* of the medical opinions . . . in [the]

case record."  20 C.F.R. § 404.1520c(a) (emphasis added).

It is true that an opinion may be less persuasive if it precedes the alleged onset date. *See*

*Caradonna v. Comm'r of Soc. Sec.*, No. 1:18-13228, 2019 WL 5549496, at *24 (E.D. Mich. Sept.

11, 2019) (indicating "it may be the case that the pre-onset evidence is less probative due to its

age if, for example, subsequent events render it outdated"), *report and recommendation adopted,*

No. 18-13228, 2019 WL 5538103 (E.D. Mich. Oct. 25, 2019).  Yet, the Commissioner fails to

identify authority to support her contention that the ALJ was not required to consider or evaluate

an opinion that predated the alleged onset date by just a few months.

Indeed, the Sixth Circuit has explained that it does "not endorse the position that all

evidence or medical records predating the alleged date of the onset of disability . . . are

necessarily irrelevant . . . ."  *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir.

2006); *see also Caradonna*, 2019 WL 5549496, at *25 (discussing *DeBoard* and explaining that

"[s]ome courts have therefore found legal error in an ALJ's failure to consider pre-onset

evidence or in the ALJs discounting evidence simply because it predated onset"), *report and*

*recommendation adopted*, No. 18-13228, 2019 WL 5538103 (E.D. Mich. Oct. 25, 2019); *Audra*

*E. v. Comm'r of Soc. Sec. Admin.*, No. 2:22-CV-1815, 2023 WL 2633669, at *6 (S.D. Ohio Mar.

24, 2023) (rejecting Commissioner's argument that the ALJ's failure to address an opinion

provided by a medical source was not error because it was authored six months prior to the alleged onset date).

Given that the evidence at issue is medical opinion evidence and the opinions were rendered less than four months before the alleged onset date, the undersigned finds the ALJ erred by failing to mention and evaluate the persuasiveness of Dr. Yuhas' opinions.  Accordingly, the undersigned turns to the Commissioner's third argument against remand.

### 4.    Whether ALJ Was Not Required to Consider or Evaluate Dr. Yuhas' Opinion Because He Evaluated State Agency Medical Consultants' Opinions

Mr. Link contends that the ALJ's failure to consider Dr. Yuhas' opinion was not harmless because a finding of disability would be warranted under the Medical Vocational Guidelines if the ALJ considered the opinion and concluded that the evidence supported a reduction to sedentary work. The Commissioner does not directly challenge this argument, but instead argues that remand is not required because the RFC is supported by the opinions of the state agency medical consultants, who considered findings from Dr. Yuhas' examination and opined that Mr. Link could perform a range of light work consistent with the RFC finding.  (ECF Doc. 10, pp. 10-11.)  Thus, the Commissioner contends that "the ALJ implicitly rejected the vague and conclusory recommendation from Dr. Yuhas."  (*Id*. at p. 11.)

The undersigned agrees that the state agency medical consultants referenced some findings from Dr. Yuhas' examination.  (Tr. 50, 63.)  Indeed, the ALJ also cited to some findings from Dr. Yuhas' examination.  (Tr. 21 (citing Tr. 965-66).)  But neither the state agency medical consultants nor the ALJ identified, referenced, or cited to the medical opinion findings of Dr. Yuhas in their discussions.  The mere fact that the ALJ and medical consultants considered Dr. Yuhas' objective findings do not persuade the undersigned that the ALJ's error in failing to consider Dr. Yuhas' opinions was harmless, or that the ALJ implicitly rejected Dr. Yuhas'

opinions.  Instead, the limited references raise further questions as to why the ALJ did not evaluate Dr. Yuhas' opinions or explain why they were not considered.

Because the ALJ did not consider the persuasiveness of Dr. Yuhas' opinions, or explain why he failed to do so, the undersigned concludes that remand is warranted to allow for a more thorough evaluation of the evidence so that the Court may meaningfully assess whether the light RFC is supported by substantial evidence.  *See e.g.*, *Stephenson v. Kijakazi*, No. 1:20-CV-113-DCP, 2021 WL 4302407, at *1 (E.D. Tenn. Sept. 21, 2021) (finding failure to properly address a medical opinion left the court "unable to meaningfully review" the ALJ's findings).

## VII.  Recommendation

For the foregoing reasons, the undersigned recommends that the Court **VACATE and REMAND** the Commissioner's decision.  On remand, the ALJ should explicitly consider the medical opinions of Dr. Yuhas, clearly articulate his findings as to the persuasiveness of Dr. Yuhas' opinions, and reassess Mr. Link's physical RFC in light of those findings.

June 8, 2023

*/s/ Amanda M. Knapp*
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 Dated: April 17, 2023(1985).